# 13-422(L)
## 13-445(CON)

# United States Court of Appeals
### FOR THE SECOND CIRCUIT
### Docket Nos. 13-422(L), 13-445(Con)

➤►►►◄

THE NEW YORK TIMES COMPANY, CHARLIE SAVAGE,
SCOTT SHANE, AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,

*Plaintiffs-Appellants*,

—v.—

UNITED STATES DEPARTMENT OF JUSTICE,
UNITED STATES DEPARTMENT OF DEFENSE,
CENTRAL INTELLIGENCE AGENCY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

PREET BHARARA
*United States Attorney for the
Southern District of New York*

SARAH S. NORMAND
*Assistant United States
Attorney*
86 Chambers Street
New York, New York 10007
(212) 637-2709

STUART F. DELERY
*Acting Assistant Attorney
General*
MATTHEW COLLETTE
SHARON SWINGLE
*Attorneys, Appellate Staff*
Civil Division, Room 7250
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 353-2689

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . .   1

JURISDICTIONAL STATEMENT  . . . . . . . . . . . . . . . . . . .   3

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . .   3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . .   4

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

    A.   Statutory Background . . . . . . . . . . . . . . . . . . .   5

    B.   Factual And Procedural Background . . . . . .   8

        1.   FOIA Requests And Agency
             Responses. . . . . . . . . . . . . . . . . . . . . . . .   8

        2.   District Court Lawsuits And Further
             Disclosures Following Senior
             Government Official Statements . . . . .   11

        3.   Summary Judgment Motion And
             Government Declarations In Support
             Of No Number, No List Responses. . .   14

            a.   Public Declarations. . . . . . . . . . .   14

            b.   Classified Declarations. . . . . . . .   18

        4.   District Court Decision . . . . . . . . . . . .   19

        5.   Additional Subsequent Disclosures . . .   23

SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . . . .   26

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . .   28

ii

PAGE

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

POINT I:  THE GOVERNMENT PROPERLY WITHHELD
          DOCUMENTS AND INFORMATION UNDER
          EXEMPTIONS 1 AND 3 AS CLASSIFIED OR
          SPECIFICALLY EXEMPT UNDER ANOTHER
          STATUTE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

    A.  The Government Established That
        Exemptions 1 And 3 Apply To The
        Classified Documents And Information
        Withheld. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

    B.  The District Court Did Not Err In
        Concluding That The Government Had
        Not Officially Disclosed The Types Of
        Information Or Documents Requested,
        So As To Lose The Protections Of FOIA
        Exemptions 1 and 3. . . . . . . . . . . . . . . . . . . .  33

        1.  Most Of The "Disclosures" On Which
            Plaintiffs Rely Are Irrelevant, Because
            Official Disclosures Can Only Be Made
            By Persons Authorized To Speak For
            The Agency. . . . . . . . . . . . . . . . . . . . . . .  33

        2.  The District Court Correctly Held That
            The Limited Public Disclosures By
            Authorized Government Officials On
            The Topic Of The Requests Did Not
            Foreclose OLC's Glomar Response To
            The New York Times Requests And
            The Agencies' No Number, No List
            Responses To The ACLU's Request. . .  37

iii

PAGE

3.  In Light Of Subsequent Public
    Disclosures By The President And
    Attorney General, DOJ Can Provide
    Limited Additional Information About
    Documents Responsive To The ACLU's
    Request, But The Government's
    Responses Otherwise Remain
    Appropriate. . . . . . . . . . . . . . . . . . . . . .  46

POINT II:  THE GOVERNMENT PROPERLY WITHHELD
    CONFIDENTIAL LEGAL ADVICE MEMORANDA
    UNDER EXEMPTION 5, AND HAS NOT "ADOPTED"
    THE WITHHELD DOCUMENTS OR USED THEM AS
    "WORKING LAW."  . . . . . . . . . . . . . . . . . . . . . .  48

    A.  The Government Established That The
        OLC-DOD Memorandum Is Protected By
        The Attorney-Client And Deliberative
        Process Privileges. . . . . . . . . . . . . . . . . . .  49

    B.  The Government Has Not "Adopted" The
        Withheld Legal Memoranda, Nor Do They
        Constitute An Agency's "Working Law.". .  50

        1.  No Agency Official Has Publicly Referred
            To The OLC-DOD Memorandum Or Any
            Other Withheld Document, Much Less
            Expressly Adopted The Reasoning In
            That Document As Agency Policy. . . .  51

        2.  The Withheld Legal Memoranda
            Constitute Confidential Legal Advice,
            Not Agency "Working Law." . . . . . . . .  55

iv

PAGE

Point III: The Department Of Justice's Office
Of Information Policy Conducted An
Adequate Search For Responsive
Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

v

PAGE

## TABLE OF AUTHORITIES

*Cases*:

*ACLU v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013). . . . . . .   7, 39, 40, 42

*ACLU v. DOJ*,
  681 F.3d 61 (2d Cir. 2012) . . . . . . . . . . . . . . . 28, 29

*Afshar v. Dep't of State*,
  702 F.2d 1125 (D.C. Cir. 1983). . . . . . . .   35, 36, 56

*Alfred A. Knopf, Inc. v. Colby*,
  509 F.2d 1362 (4th Cir. 1975) . . . . . . . . . . . . . . 37

*Bassiouni v. CIA*,
  392 F.3d 244 (7th Cir. 2004) . . . . . . . . . . . . . . 8, 45

*Berman v. CIA*,
  501 F.3d 1136 (9th Cir. 2007) . . . . . . . . . . . . . . 32

*Bonner v. Dep't of State*,
  928 F.2d 1148 (D.C. Cir. 1991). . . . . . . . . . . . . . 46

*Brennan Center for Justice v. U.S. Dep't of Justice*,
  697 F.3d 184 (2d Cir. 2012) . . . . . . . . . . . . . *passim*

*Brinton v. Dep't of State*,
  636 F.2d 600 (D.C. Cir. 1980). . . . . . . . . . . . . . . 59

*CIA v. Sims*,
  471 U.S. 159 (1985). . . . . . . . . . . . . . . . . . . . . . . 5

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980). . . . . . . . . . . . . . . 58

vi

PAGE

*Cuneo v. Schlesinger*,
    484 F.2d 1086 (D.C. Cir. 1973)............... 56

*Defenders of Wildlife v. U.S. Dep't of Interior*,
    314 F. Supp. 2d 1 (D.D.C. 2004) ............. 60

*Dep't of Justice v. Reporters Comm. for Freedom
    of the Press*,
    489 U.S. 749 (1989)....................... 56

*Earth Pledge Foundation v. CIA*,
    988 F. Supp. 623 (S.D.N.Y. 1996),
    *aff'd*, 128 F.3d 788 (2d Cir. 1997) ........ 34, 35

*Edmonds Inst. v. U.S. Dep't of Interior*,
    383 F. Supp. 2d 105 (D.D.C. 2005) ........... 60

*Federal Open Market Committee v. Merrill*,
    443 U.S. 340 (1979)........................ 51

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990)................ 36

*Grand Cent. P'ship, Inc. v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999) ................. 60

*Halperin v. CIA*,
    629 F.2d 144 (D.C. Cir. 1980)................ 32

*Halpern v. FBI*,
    181 F.3d 279 (2d Cir. 1999) ................. 7

*Hayden v. NSA,*,
    608 F.2d 1381 (D.C. Cir. 1979)............... 8

vii

PAGE

*Hoch v. CIA,*
No. 88-5422, 1990 WL 102740 (D.C. Cir.
Jul. 20, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re County of Erie,*
473 F.3d 413 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 49

*Jarvik v. CIA,*
741 F. Supp. 2d 106 (D.D.C. 2010) . . . . . . . . . . . 8

*Meeropol v. Meese,*
790 F.2d 942 (D.C. Cir. 1986). . . . . . . . . . . . . . . 46

*Military Audit Project v. Casey,*
656 F.2d 724 (D.C. Cir. 1981). . . . . . . . . . . . 34, 45

*Moore v. CIA,*
666 F.3d 1330 (D.C. Cir. 2011). . . . . . . . . . . . . . 34

*Murphy v. Dep't of Army,*
613 F.2d 1151 (D.C. Cir. 1979). . . . . . . . . . . . . . 35

*National Council of La Raza v. Dep't of Justice,*
411 F.3d 350 (2d Cir. 2005) . . . . . . . . . . 52, 53, 55

*NLRB v. Sears, Roebuck & Co.,*
421 U.S. 132 (1975). . . . . . . . . . . . . . . . . . . . . . 52, 59

*Phillippi v. CIA,*
546 F.2d 1009 (D.C. Cir. 1976). . . . . . . . . . . . . . . 7

*Phillippi v. CIA,*
655 F.2d 1325 (D.C. Cir. 1981). . . . . . . . . . . . . . 36

*Public Citizen, Inc. v. Office of Mgmt. and Budget,*
598 F.3d 865 (D.C. Cir. 2010). . . . . . . . . . . . . . . 58

viii

PAGE

*Tax Analysts v. IRS*,
    294 F.3d 71 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . 58

*Tigue v. DOJ*,
    312 F.3d 70 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . 50

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973). . . . . . . . . . . . . . . . 7

*Wilner v. NSA,*,
    592 F.3d 60 (2d Cir. 2009) . . . . . . . . .  7, 28, 29, 45

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009) . . . . . . .  33, 34, 36, 37

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . 28, 33

*Statutes and Legislative History*:

5 U.S.C. § 1002 (repealed 1966) . . . . . . . . . . . . . . . . 56

5 U.S.C. § 552(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5 U.S.C. § 552(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . 3

5 U.S.C. § 552(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5 U.S.C. § 552(b)(1) . . . . . . . . . . . . . . . . . . . . . . 4, 5

5 U.S.C. § 552(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . 6

5 U.S.C. § 552(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ix

PAGE

50 U.S.C. § 403g (2010) . . . . . . . . . . . . . . . . . . 6, 21, 31

50 U.S.C. § 403-1(i)(1) (2012). . . . . . . . . . . . . 6, 16, 31

H.R. Rep. No. 79-1980 (1946) . . . . . . . . . . . . . . . 56

S. Rep. No. 89-813 (1965) . . . . . . . . . . . . . . . . . . 56

*Regulations and Executive Orders*:

28 C.F.R. § 0.5(a) . . . . . . . . . . . . . . . . . . . . . . . . . 57

28 C.F.R. § 0.25 . . . . . . . . . . . . . . . . . . . . . . . . . . 57

28 C.F.R. § 16.1(b) . . . . . . . . . . . . . . . . . . . . . . . 60

28 C.F.R. § 16.3(a) . . . . . . . . . . . . . . . . . . . . . . . 60

28 C.F.R. § 16.4(a) . . . . . . . . . . . . . . . . . . . . . . . 60

Exec. Order 13,526, 75 Fed. Reg. 707
    (Dec. 29, 2009) . . . . . . . . . . . . . . . . . . . . . 6, 7, 31

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 13-422(L), 13-445(Con)

———————

THE NEW YORK TIMES, CHARLIE SAVAGE, SCOTT SHANE, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION,

*Plaintiffs-Appellants,*

—v.—

UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DEPARTMENT OF DEFENSE, CENTRAL INTELLIGENCE AGENCY,

*Defendants-Appellees.*

———————

## BRIEF FOR DEFENDANTS-APPELLEES

———————

## PRELIMINARY STATEMENT

The government has worked to provide Congress and the American people as much information as possible about sensitive counterterrorism operations, including the use of targeted lethal force against terrorists, consistent with our national security and the proper functioning of the Executive Branch. The government has disclosed certain key elements of the principles and procedures involved in a determina-

2

tion whether to use targeted lethal force, and also has disclosed certain limited information about specific operations and individuals. At the same time, however, the Executive Branch has protected the national security by safeguarding classified information, the disclosure of which could damage the government's counterterrorism efforts. Consistent with this careful balancing, the government agencies that are defendants in these actions disclosed certain documents and information to plaintiffs in response to their Freedom of Information Act (FOIA) requests, but withheld other documents and information that are protected from disclosure by FOIA Exemptions 1 and 3, because disclosure could reasonably be expected to harm national security and would violate non-disclosure statutes. The defendants also withheld predecisional and deliberative documents prepared to assist agency policymakers, and confidential legal advice memoranda, because those privileged documents are protected under FOIA Exemption 5.

The district court properly held that the government's withholdings were justified under FOIA, reasoning in relevant part that the government had established the applicability of Exemptions 1, 3, and 5 to the withheld documents and information, and that the government had not already officially disclosed the information withheld under Exemptions 1 and 3, nor "adopted" privileged documents withheld under Exemption 5. Those rulings were clearly correct, and this Court should affirm the judgment below.

3

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over these actions under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. The district court entered judgment for the defendants on January 24, 2013. Plaintiffs filed timely notices of appeal on February 1, 2013. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the government properly withheld information about records possessed by each agency that were responsive to plaintiffs' FOIA requests but exempt from disclosure under FOIA Exemptions 1 and 3, where the agencies' declarations established that the withheld information would tend to disclose highly classified information about the United States Government's use of targeted lethal force.

2. Whether public statements about the United States Government's use of targeted lethal force against terrorists constituted official disclosure of the specific information requested by plaintiffs such that the agencies erred in withholding certain records and information under FOIA Exemptions 1 and 3.

3. Whether legal advice about the use of targeted lethal force against terrorists is protected against disclosure under Exemption 5 because it is protected by the attorney-client and/or deliberative process privileges and, if so, whether public statements by government officials defending the lawfulness of the use of targeted lethal force against terrorists "adopt" the content of privileged legal analysis so as to strip it of Exemption 5 protection.

4

4. Whether the Department of Justice's Office of Information Policy (OIP) conducted an adequate search for responsive documents.

## STATEMENT OF THE CASE

These consolidated appeals arise out of FOIA requests filed by two sets of requesters. The New York Times Company and two reporters (collectively, the New York Times) filed requests with the Department of Justice's Office of Legal Counsel (OLC) for production of any legal memoranda regarding "targeted killing" by the United States Government of suspected terrorists, including U.S. citizens. The American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively, the ACLU) filed a request with multiple government agencies for production of records regarding targeted killing of U.S. citizens, including three specific individuals.

The government produced some documents, but withheld additional responsive documents because they were exempt from production under FOIA Exemptions 1, 3, and/or 5, 5 U.S.C. § 552(b)(1), (3), and/or (5). The government also declined to provide information about the number or nature of responsive classified documents, on the ground that that information was itself exempt from disclosure.

Plaintiffs' lawsuits challenging the government's responses were consolidated by the district court. The defendants moved for summary judgment, and plaintiffs cross-moved for partial summary judgment. After considering the motions and supporting documents, including classified materials submitted by

the government *in camera* and *ex parte,* the district court entered judgment in favor of the government in two unclassified decisions, one of which had a classified appendix.

## STATEMENT

### A.  Statutory Background.

The Freedom of Information Act, 5 U.S.C. § 552(a)(3), generally requires an agency to search for and make records promptly available in response to a request that reasonably describes the records sought. At the same time, however, Congress explicitly recognized "that public disclosure is not always in the public interest and thus provided that agency records may be withheld from disclosure under any of the nine exemptions defined in 5 U.S.C. § 552(b)." *CIA v. Sims,* 471 U.S. 159, 166-167 (1985).

FOIA Exemption 1 exempts from disclosure records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Pursuant to Executive Order 13,526, an agency may withhold information that has been determined to be classified because its "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security" and it "pertains to" one of the categories of information specified in the Executive Order, including "intelligence activities (including covert action)," "intelligence sources or methods," and "foreign relations or foreign activities of the

6

United States." Exec. Order 13,526, § 1.4(c), (d), 75 Fed. Reg. 707, 709 (Dec. 29, 2009).

FOIA Exemption 3 exempts from disclosure records that are "specifically exempted from disclosure by [another] statute" if the relevant statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). The Central Intelligence Agency Act of 1949, as amended, exempts the CIA from any law requiring the disclosure of certain information about the CIA, including the CIA's "functions." 50 U.S.C. § 403g (2010) ("Protection of nature of Agency's functions"). And the National Security Act of 1947, as amended, directs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1) (2012).

FOIA Exemption 5 exempts from disclosure records that are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 encompasses traditional common-law privileges, including the attorney-client and deliberative process privileges. *See Brennan Center for Justice v. U.S. Dep't of Justice,* 697 F.3d 184, 189 (2d Cir. 2012).

Where an agency claims that responsive documents are exempt from disclosure under FOIA, it generally describes the individual documents and sets forth the applicable exemptions pursuant to the

7

judge-made standards set out in *Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973). This Court has made clear, however, that "rigid adherence to any particular indexing format" is not required. *Halpern v. FBI,* 181 F.3d 279, 291 (2d Cir. 1999); *see also ACLU v. CIA,* 710 F.3d 422, 432 (D.C. Cir. 2013) (noting that "there is no fixed rule establishing what a *Vaughn* index must look like").

In some circumstances, an agency cannot acknowledge whether or not documents exist that are responsive but exempt, without also disclosing information that is itself protected from disclosure by an exemption. In such circumstances, the agency may make a so-called "Glomar" response that neither confirms nor denies the existence of responsive documents. *See Wilner v. NSA,* 592 F.3d 60, 68 (2d Cir. 2009).[1] Executive Order 13,526 explicitly authorizes an agency, in response to a FOIA request, to "refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified." Exec. Order 13,526, § 3.6(a), 75 Fed. Reg. at 718-719.

Even where an agency can disclose the existence of responsive records, the agency may be unable to

————————

[1] The Glomar response was first recognized in *Phillippi v. CIA,* 546 F.2d 1009 (D.C. Cir. 1976), in which the CIA refused to confirm or deny whether it had documents relating to a ship, the Glomar Explorer, that had reportedly been used in an attempt to recover a sunken Soviet submarine.

8

reveal the number of responsive records, or provide
the types of details about those documents that are
normally set forth in a *Vaughn* index, without dis-
closing information that is protected from disclosure
by a FOIA exemption. *See Hayden v. NSA,* 608 F.2d
1381, 1384 (D.C. Cir. 1979) (recognizing that an
agency need not provide the number of responsive
records or an index describing them if that infor-
mation is itself exempt from disclosure). In such cir-
cumstances, the agency may make a "no number, no
list" response, which acknowledges the existence of
responsive but exempt documents, but provides no
additional detail about those documents to the re-
quester. *See Bassiouni v. CIA,* 392 F.3d 244, 246-247
(7th Cir. 2004) (upholding such a response); *Jarvik v.
CIA,* 741 F. Supp. 2d 106, 111-113 (D.D.C. 2010); *see
also* ACLU Br. 35 (acknowledging that "there may be
circumstances in which an agency could justify a 'no
number no list' response").

## B.   Factual And Procedural Background.

### 1.   FOIA Requests And Agency Responses.

As indicated above, these appeals arise out of two
consolidated lawsuits challenging the adequacy of the
government's responses to FOIA requests.

The first action was brought by the New York
Times and two of its reporters (collectively, the "New
York Times") challenging the response by the De-
partment of Justice to two FOIA requests. One re-
quest was submitted to the Department of Justice's
Office of Legal Counsel (OLC), and sought "[OLC]
opinions or memoranda since 2001 that address the

9

legal status of targeted killing, assassination, or kill-
ing of people suspected of ties to Al Qaeda or other
terrorist groups by employees or contractors of the
United States government." JA 297. The request spe-
cifically encompassed "legal advice * * * to the mili-
tary [or] the Central Intelligence Agency." JA 297.
The second New York Times request, also submitted
to OLC, sought OLC memoranda "analyzing the cir-
cumstances under which it would be lawful for Unit-
ed States armed forces or intelligence community as-
sets to target for killing a United States citizen who
is deemed to be a terrorist." JA 301.

In response to the first New York Times request,
OLC responded that, insofar as the request pertained
to the Department of Defense (DOD), OLC had
searched its files and processed responsive documents
but was withholding the documents pursuant to
FOIA Exemptions 1, 3, and/or 5.[2] Insofar as the re-
quest pertained to the CIA or any other federal gov-

_____

    [2]  Although OLC's response letter to this request
does not specify the number of responsive records
identified, JA 299, OLC subsequently clarified that it
had identified one record that was responsive to the
request as it pertained to DOD, JA 289-290. Moreo-
ver, as discussed below, following public speeches by
senior administration officials regarding the legal ba-
sis for potential use of lethal force against senior op-
erational members of Al Qaida and associated forces,
even if they are U.S. citizens, OLC acknowledged that
this one document pertaining to DOD was also re-
sponsive to the second New York Times request.

10

ernment agencies, OLC provided a Glomar response, stating that it would neither confirm nor deny whether it possessed responsive documents because that information was itself exempt from disclosure under Exemptions 1, 3, and/or 5. JA 299. OLC also provided a Glomar response to the second New York Times request, declining to confirm or deny whether it possessed responsive records, on the basis that that information was itself exempt from disclosure under Exemptions 1, 3, and 5. JA 303.

The second action was brought by the ACLU, arising out of a FOIA request submitted to the CIA and to certain offices within DOD and DOJ. JA 38, 305-306. The ACLU request referenced news reports that claimed that Anwar al-Awlaki, a U.S. citizen, had been killed in Yemen by an unmanned aerial vehicle (or "drone") operated by the CIA or the DOD's Joint Special Operations Command. JA 306. The ACLU request also described news reports that another U.S. citizen, Samir Khan, had been killed in the same attack, and that a third U.S. citizen, Abdulrahman al-Awlaki, was killed by a subsequent drone strike in southern Yemen. JA 306-307. The ACLU requested multiple categories of documents, including:

- all records pertaining to the legal basis upon which U.S. citizens can be subjected to targeted killings;

- all records pertaining to the process by which U.S. citizens can be designated for targeted killing, including who is authorized to make a determination and what evidence is necessary;

11

- all records produced by OLC pertaining to the legal basis for the targeted killing of Anwar al-Awlaki;

- all records pertaining to the factual basis for the targeted killing of Anwar al-Awlaki;

- all records pertaining to the factual basis for the killing of Samir Khan; and

- all records pertaining to the factual basis for the killing of Abdulrahman al-Awlaki.

JA 309-310. OLC initially provided a Glomar response, neither confirming nor denying whether it possessed responsive records, invoking Exemptions 1, 3, and 5 to withhold this information. JA 318. The CIA similarly issued an initial Glomar response, declining to confirm or deny whether it possessed responsive records, invoking Exemptions 1 and 3. JA 45. DOD and the other DOJ component were still processing the request when the ACLU filed suit to compel disclosure.

## 2. District Court Lawsuits And Further Disclosures Following Senior Government Official Statements.

Dissatisfied with the responses to their FOIA requests, the New York Times brought suit against DOJ and the ACLU filed a separate action against DOJ, DOD, and the CIA.

After the cases were filed, senior government officials publicly addressed significant legal and policy

12

issues pertaining to United States counterterrorism operations and the potential use of lethal force. The Attorney General, Eric Holder, gave a speech on March 5, 2012, in which he stated that it is lawful for the United States Government to use lethal force against a senior operational leader of Al Qaida and associated forces, even if the individual is a U.S. citizen, and outlined relevant factors bearing on the lawfulness of such an operation. JA 85-86. On April 30, 2012, John Brennan, who was then Assistant to the President for Homeland Security and Counterterrorism, explained in a speech that, "in full accordance with the law, and in order to prevent terrorist attacks on the United States and to save American lives, the United States Government conducts targeted strikes against specific al-Qaida terrorists, sometimes using remotely piloted aircraft," or drones. JA 95. Brennan described "in broad terms" the "standards and process of review" employed in "authorizing strikes against a specific member of al-Qaida outside the hot battlefield of Afghanistan," JA 98, including additional review for the use of lethal force against a U.S. citizen. JA 102-103.

In light of those speeches, DOJ determined that it was no longer limited to providing a Glomar response to the ACLU's request and could publicly confirm "generally the existence of records relating to the broad topics addressed in the ACLU's request, including records related to the Attorney General's speech which addressed legal issues pertaining to the poten-

tial use of lethal force against U.S. citizens." JA 192.[3] DOJ identified 64 responsive, unclassified documents relating to this general topic in two *Vaughn* indexes, JA 324-333, 453-454, which the ACLU has confirmed that it does not seek. *See* SPA 52. In addition, DOJ acknowledged that it had identified classified documents that were responsive but exempt. However, DOJ determined that it could provide only a no number, no list response and could not provide details about responsive but exempt classified records, including the volume, dates, or nature of those records, without causing undue harm to national security. JA 191-192. The CIA also determined, in light of the speeches, that it was no longer limited to providing a Glomar response to the ACLU generally and could acknowledge the existence of responsive documents. JA 209. However, with one minor exception (*see* p. 15 n.5, *infra*), the CIA determined that it could provide only a no number, no list response and could not pro-

---

[3]    The DOJ's OLC generally continued to maintain its responses to the New York Times requests. As described above (at pp. 9-10 & n.2, *supra),* OLC had acknowledged that, insofar as the first New York Times request pertained to DOD, OLC had identified one responsive but exempt document, which it subsequently determined was also responsive to the second New York Times request. JA 289-290. Insofar as the New York Times requests pertained to the CIA or other government agencies, OLC neither confirmed nor denied the existence of responsive documents. *See* JA 286-287.

14

vide information about the number or nature of any responsive but exempt records. JA 209. DOJ and the CIA also declined to confirm whether or not they possessed records that are responsive to any of the specified subcategories of the records sought by the ACLU. JA 209, 289, 291-292.

### 3. Summary Judgment Motion And Government Declarations In Support Of No Number, No List Responses.

The government moved for summary judgment and submitted numerous public and classified declarations providing information about responsive but exempt documents and the basis for the government's Glomar and no number, no list responses.

### a. Public Declarations.

As noted above, in response to the New York Times requests, DOJ confirmed that it had one responsive document addressing the legal status of targeted killing of suspected terrorists insofar as the first request related to DOD, and that this document was also responsive to the second New York Times request. JA 289. Deputy Assistant Attorney General of OLC John Bies explained in a public declaration that there was one responsive classified memorandum relating to DOD, which was protected under FOIA Exemptions 1, 3, and 5. JA 286-287.[4] DOJ

_____

[4]   In addition to the Bies declaration supporting the withholding of OLC documents, DOJ submitted a declaration from Douglas Hibbard, Deputy Chief of

15

maintained a Glomar response and declined to con-
firm whether it had documents insofar as the New
York Times requests related to the CIA or any other
agency. JA 299, 303.

To support DOJ's response, the government also
submitted a public declaration from John Bennett,
Director of the National Clandestine Service of the
CIA, who explained that the CIA had asked DOJ to
issue a Glomar response to the first New York Times
request to the extent it pertained to the CIA.[5]

As also noted above, in response to the ACLU's
somewhat different request, DOJ issued a no num-
ber, no list response for responsive but exempt classi-
fied documents. JA 291-292. John Hackett, an official
with the Office of the Director of National Intelli-
gence, submitted a public declaration explaining why
further details about such responsive but exempt
documents could not be disclosed without also reveal-

_____

the Initial Request Staff of OIP, describing the search
of other offices and components of DOJ and the with-
holding of exempt records. JA 410-424.

[5]   The CIA made a limited exception to this re-
sponse. As Bennett explained, the United States had
officially acknowledged that it conducted the opera-
tion resulting in the death of Usama Bin Laden, and
that the CIA participated in that operation. JA 241.
Whether or not there were OLC opinions addressing
the CIA's involvement in that operation was not clas-
sified, Bennett explained, although he further noted
that no such opinions existed. JA 241.

16

ing classified information protected by Exemption 1
and information about intelligence sources and meth-
ods protected by Exemption 3. JA 192-193. For exam-
ple, if DOJ were to acknowledge possession of a large
volume of responsive records, that would tend to re-
veal the depth and breadth of the United States Gov-
ernment's lethal targeting activities and its efforts to
target senior operational leaders of Al Qaida. JA 193-
194. On the other hand, acknowledgment of "a small
amount of material would indicate that no authority
had been granted, or possibly that the issue had not
been raised with DOJ and therefore was not being
considered." JA 194. Revealing this information could
benefit terrorists and other adversaries in responding
to United States counterterrorism activities and in
their recruitment efforts. JA 195. Disclosing such in-
formation could also reveal whether the United
States was operating or planning clandestine opera-
tions abroad. JA 196-197.

Hackett explained that he had reviewed respon-
sive records identified by DOJ, including the one OLC
memorandum related to DOD that had been publicly
acknowledged, and had determined that they con-
tained classified information at the Secret and Top
Secret levels and also contained information about
intelligence sources and methods that was protected
from disclosure by Section 102A(i)(1) of the National
Security Act, as amended, 50 U.S.C. § 403-1(i)(1).
JA 198.

With regard to the CIA's no number, no list re-
sponse to the ACLU request, which acknowledged re-
sponsive but exempt documents and explained that

17

further details could not be provided, John Bennett explained in his public declaration that providing any information about the number or nature of responsive records, or whether they relate to any specific subcategory of the ACLU's request, would reveal classified information concerning intelligence sources and methods and core CIA functions. JA 203-204, 217-224. For example, disclosing the number of responsive but exempt records would tend to reveal whether or not CIA had authority to participate directly in the use of targeted lethal force. JA 217-222. Disclosing whether the CIA had intelligence about the imminence of the threat posed by Anwar al-Awlaki could reveal information about the existence and identity of intelligence sources and methods. JA 229-230, 233. Disclosing whether the CIA was involved in operations leading to the deaths of al-Awlaki, Samir Khan, or Abdulrahman al-Awlaki would tend to reveal whether the CIA was using unmanned aerial vehicles and was engaged in clandestine intelligence activities. JA 234-236. Information suggesting that the CIA was involved in intelligence activities abroad also could reasonably be expected to harm U.S. relationships with the affected nation or nations. JA 236-237.

Finally, DOD, which had not yet responded to the ACLU's request at the time suit was brought, submitted a public declaration from the Director of Operations for the Joint Staff at the Pentagon, Lieutenant General Robert Neller, explaining that DOD had identified documents that were responsive to the ACLU's request but was withholding certain documents under Exemption 5 because they were privileged and was issuing a "no number, no list" response

18

with respect to most of the classified documents, which were covered by Exemption 1. JA 336. Two unclassified documents, which ACLU seeks on appeal, ACLU Br. 8-9, are memoranda sent to the White House's National Security Council Legal Advisor by the Legal Counsel to the Chairman of the Joint Chiefs of Staff, addressing the legal basis for conducting military operations against U.S. citizens. DOD withheld those two documents under Exemption 5 on the basis of the deliberative process privilege. JA 338-339, 408-409. DOD also acknowledged the existence of the OLC-DOD memorandum identified in OLC's response, but withheld it under Exemptions 1 and 5 on the grounds that the document contained classified information and was also predecisional and deliberative. JA 339-341.

### b.     Classified Declarations.

The classified declarations that the government filed *in camera* and *ex parte* provided additional information about responsive documents and the basis for withholding documents and information.

### [Classified Insert A][6]

─────────

[6]     Simultaneous with the filing of this brief, the government is moving to file with the Court *in camera* and *ex parte* Classified Inserts to the Brief for Defendants-Appellees. The Classified Inserts address classified information considered by the district court and the classified appendix to its first public decision. Each "Classified Insert" referenced in this brief refers to a section of the classified document. The proposed

19

### 4. **District Court Decision.**

The district court issued two public opinions, as well as a classified appendix to the first opinion, which granted the government's motion for summary judgment.

In its first public opinion, the district court upheld the adequacy of the government's searches in response to the New York Times and ACLU requests. SPA 32-33. The court also held that the government's responses to those requests were adequate and lawful. The court noted that nearly all of the responsive documents at issue were classified, and that appropriate authorities from each of the agencies filed declarations establishing that the documents were classified in accordance with proper procedures. SPA 36; *see also* SPA 36-37 (rejecting argument that legal analysis cannot be classified).

The district court rejected plaintiffs' argument that the government waived Exemption 1 protection for classified documents, holding that the public statements on which plaintiffs relied did not meet the "strict" test for official disclosure, which requires authorized public disclosure of the specific information the requester seeks. SPA 38-41.

The district court emphasized that the government had not officially disclosed operational details of any use of targeted lethal force, with the exception of the operation resulting in Usama Bin Laden's death.

—————

filing has been lodged with the Court Security Officer.

20

SPA 39. After reviewing public statements about the drone strike that killed Anwar al-Awlaki, the court concluded that the United States Government had, at most, acknowledged that it played some role in the operation. The court reasoned that that did not constitute official disclosure of the factual basis for the targeted killing of Anwar al-Awlaki. SPA 39. The court also reasoned that there had been no official disclosure of the factual basis for the killings of Samir Khan or Abdulrahman Al-Awlaki, about whom plaintiffs had not "identified a single statement by a current, named executive branch official." SPA 39.

The court then held that there had been no official disclosure of records or information responsive to plaintiffs' requests for "the analysis used to justify the legality of targeted killings." SPA 39. The court noted that Attorney General Holder's March 2012 speech generally discussed legal considerations that the Executive Branch takes into account before targeting a terrorist, but concluded that the speech did not contain the government's "actual reasoning." SPA 39-40. Similarly, the district court noted that other officials had repeated publicly the conclusions voiced in the Attorney General's speech but that "none of those public pronouncements reveals the necessarily detailed legal analysis that supports the Administration's conclusion that targeted killing, whether [of] citizens or otherwise, is lawful." SPA 41.

The district court noted that the government had acknowledged in response to the New York Times requests that OLC possessed one classified document containing legal advice about the use of targeted le-

21

thal force − the OLC-DOD memorandum − but rea-
soned that the analysis in that memorandum must
have been "far more detailed and robust" than the
statements in the Attorney General's March 2012
speech. SPA 41-42. The district court also noted that
Exemption 5 would shield that document as privi-
leged even if Exemption 1 did not shield it as a classi-
fied matter. SPA 42.

As to documents withheld under Exemption 3's
provision regarding records specifically exempted
from disclosure by some other statute, the district
court agreed that Section 102A(i)(1) of the National
Security Act, as amended, which protects against the
unauthorized disclosure of "intelligence sources and
methods," is an exempting statute, and rejected the
ACLU's argument that a government drone strike
program could not implicate an intelligence source or
method. SPA 45-46. The court also held that any in-
formation sought by the ACLU regarding the CIA's
participation in a targeted killing program would be
protected from disclosure under the CIA Act, 50
U.S.C. § 403g. SPA 46-47. The court reasoned that
confirming the existence or nonexistence of such re-
sponsive records could reveal information about the
CIA's capabilities, potential interests in, or any in-
volvement in a drone program − *i.e.,* the "functions" of
the CIA and its personnel. SPA 47. The district court
agreed with the ACLU that legal analysis would not
be an intelligence source or method nor implicate CIA
"functions," but held that legal analysis could be
withheld if it were inextricably intertwined with ex-
empt information or independently protected under
Exemption 1 or 5. SPA 46-47. The court found it un-

22

necessary to decide whether any legal analysis could be segregated, noting that Exemption 5's coverage of privileged records would shield the document in any event. SPA 46.[7]

The district court also upheld the government's withholding of privileged documents under Exemption 5. The court held that the OLC-DOD memorandum was protected by the attorney-client and deliberative process privileges. SPA 52. The district court rejected the argument that the memorandum had been "adopted" or constituted "working law" subject to compelled disclosure, concluding that government officials had never publicly referenced the document or its legal analysis. SPA 58-60. The district court also noted that the ACLU sought two unclassified DOD memoranda containing legal analysis regarding the effect of U.S. citizenship on targeting enemy belligerents. SPA 54. The district court permitted DOD to submit a supplemental declaration regarding these documents, SPA 54-55, and subsequently concluded in its second public decision that the documents "fall squarely within the deliberative process privilege." SPA 70.

---

[7] The New York Times erroneously claims that the district court held that the government's withholding of documents under Exemption 3 "could not be justified under either the NSA Act or the CIA Act." NYT Br. 9. In fact, the court found that it would be "pointless" to reach the issue given that "Exemption 5 plainly applies." SPA 46.

23

Finally, the district court upheld the DOJ's Glomar response to the New York Times requests insofar as they pertained to the CIA or other agencies, and the "no number, no list" responses filed by the agencies in response to the ACLU's request. The district court acknowledged that the statements made by government officials would indicate that the CIA is likely to have an interest in the legal basis upon which U.S. citizens can be subjected to targeted lethal force and the process for designating a U.S. citizen. SPA 65. The court emphasized, however, that "it is a far cry from the extremely general statements made by President Obama and Secretary (and former CIA Director) Panetta about the involvement of the 'intelligence community' in such operations to a conclusion that the Agency had waived its right to assert a Glomar response if disclosing the existence of such documents in its files would expose classified material containing intelligence sources and methods." SPA 66. Nor were there any public statements acknowledging the existence of any particular records pertaining to targeted killing operations. SPA 66. The court similarly concluded that no public statements by Executive Branch officials had disclosed the existence of particular records in the other agencies' possession responsive to the ACLU's request, "let alone the *number* or *nature* of those records." SPA 67.

**[Classified Insert B]**

## 5.  Additional Subsequent Disclosures.

Following the district court's decisions, the government made a number of additional public disclo-

24

sures that relate to the topics of the plaintiffs' FOIA requests.

On May 22, 2013, at the direction of the President, the Attorney General sent a public letter to Senator Leahy, Chairman of the Senate Judiciary Committee, and copied to other congressional leaders, "disclos[ing] certain information that until [then had] been properly classified." Leahy Ltr., at 1 (available at *www.justice.gov*). "Since 2009, the United States, in the conduct of U.S. counterterrorism operations against al-Qa'ida and its associated forces outside of areas of active hostilities, has specifically targeted and killed one U.S. citizen, Anwar al-Aulaqi." *Id.* at 1-2. The Attorney General explained that the "United States is further aware of three other U.S. citizens who have been killed in such U.S. counterterrorism operations over that same time period: Samir Khan, 'Abd al-Rahman Anwar al-Aulaqi, and Jude Kenan Mohammed," and that those three "individuals were not specifically targeted by the United States." *Id.* at 2. The Attorney General's letter states that Anwar al-Aulaqi "plainly satisfied" the legal standards for the use of targeted legal force because he had engaged in terrorist activity described in the letter, as determined by "Department of Justice lawyers" and "other departments and agencies within the U.S. government" "after a thorough and searching review." *Id.* at 3-4.

The following day, the President gave a speech in which he explained that he had authorized declassification of the information in the Attorney General's May 22, 2013 letter about the targeting of Anwar al-

Awlaki and the death of three additional U.S. citizens, and briefly described Anwar al-Awlaki's involvement in terrorist activities targeting the United States. *See http://www.whitehouse.gov/the-press-office/2013/05/23/remarks-president-national-defense-university*.

In addition, after a copy of a document dated November 8, 2011 was leaked to the press, the Department of Justice officially released on February 4, 2013 a draft analysis of the lawfulness of the use of lethal force in a foreign country against a U.S. citizen who is a senior operational leader of Al Qaida or an associated force. *See* ACLU Br. 20-21.[8]

Finally, government officials have publicly acknowledged that OLC has provided some form of advice pertaining to the use of targeted lethal force. In a February 7, 2013 hearing before the Senate Select Committee on Intelligence related to his nomination as Director of the CIA, John Brennan explained,

_____

[8] The ACLU claims incorrectly that this document was not identified on a *Vaughn* index. Putting aside the fact that ACLU had narrowed its request to exclude draft legal analysis, *see* JA 418, 445, the document was part of document number 60 on the *Vaughn* index submitted by the Office of Legal Counsel as an attachment to a responsive e-mail, described as "draft legal analysis regarding the application of domestic and international law to the use of lethal force in a foreign country against U.S. citizens in certain circumstances." JA 333.

26

in response to a question about the United States
Government's use of lethal force against a U.S. citi-
zen, that "[t]he Office of Legal Counsel advice estab-
lishes the legal boundaries within which we can op-
erate." Brennan Hearing Tr. 57, cited in ACLU
Br. 24. On March 6, 2013, the Attorney General testi-
fied before the Senate Judiciary Committee, and re-
ferred to "OLC advice" about the subject of the draft
white paper. *See* ACLU Br. 25. As discussed below (at
pp. 46-48, *infra*), although the government was not
required to reprocess its earlier responses to the
plaintiffs' FOIA requests in light of those subsequent
developments, the government has evaluated wheth-
er it could provide additional information in light of
these public disclosures.

## SUMMARY OF ARGUMENT

I. The district court correctly upheld the govern-
ment's withholding of records and information under
Exemptions 1 and 3 because such material was clas-
sified or specifically exempted from disclosure by an-
other statute. The government's declarations ex-
plained that disclosure of the records and information
sought by plaintiffs would tend to reveal classified
information about potential clandestine operations,
whether the CIA or other agencies were authorized to
engage in such operations, and information about
surveillance methods and potential clandestine activi-
ties in foreign countries. The agencies' explanations
about why the records and information sought are
classified, which are entitled to substantial weight,
are plausible and logical. Furthermore, because the
documents and information sought by plaintiffs per-

27

taining to the CIA related to functions of the CIA and could reveal intelligence sources and methods, they were properly withheld under Exemption 3 and the applicable exempting statutes.

The district court did not err in holding that the government had not officially disclosed the requested documents or information elsewhere. Most of the sources on which plaintiffs rely for their alleged "official disclosure" are irrelevant as a matter of law. Statements by Members of Congress, former agency officials, or the press are not official government disclosure of protected Executive Branch records or information under FOIA. Authorized Executive Branch officials made limited disclosures about the government's use of targeted lethal force, but − as is clear from the classified and unclassified declarations − the information disclosed was not as specific as, and did not match, the documents or information requested. The district court properly concluded that the government had not confirmed operational details of the use of targeted lethal force, whether the CIA or other agencies had been authorized to use such force, or other highly classified information, which remains protected under FOIA Exemptions 1 and 3.

II. The Government also properly withheld privileged legal memoranda as exempt from mandatory disclosure under Exemption 5. The government's declarations clearly established that the withheld documents were protected by the attorney-client and deliberative process privileges. The government has not publicly referenced or taken any other action that could be construed as expressly adopting or incorpo-

28

rating them by reference. In addition, the withheld legal advice is not working law. The documents provided legal advice regarding the lawfulness of the use of lethal force that is predecisional to the ultimate policy decision whether to engage in a particular operation, which is not made by OLC or other legal analysts.

III. The ACLU's challenge to the adequacy of OIP's search for responsive documents is without merit. OIP reasonably selected the date the search commenced as the cut-off date, and the fact that another component might have found additional responsive documents does not undermine the reasonableness of the search.

## STANDARD OF REVIEW

The Court reviews *de novo* a district court's grant of summary judgment in FOIA litigation. *See Wilner,* 592 F.3d at 69. Although an agency withholding documents that are exempt from a FOIA request has the burden to establish the applicability of the exemptions claimed, "[a]ffidavits or declarations giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *ACLU v. DOJ,* 681 F.3d 61, 69 (2d Cir. 2012). Where the claimed exemptions implicate national security, the reviewing court "must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.* (quoting *Wolf v. CIA,* 473 F.3d 370, 374 (D.C. Cir. 2007)). "Ultimately, an agency may invoke a FOIA exemption if its justification

29

'appears logical or plausible.'" *ACLU,* 681 F.3d at 69
(quoting *Wilner,* 592 F.3d at 73).

**A R G U M E N T**

**POINT I**

**THE GOVERNMENT PROPERLY WITHHELD
DOCUMENTS AND INFORMATION UNDER
EXEMPTIONS 1 AND 3 AS CLASSIFIED
OR SPECIFICALLY EXEMPT UNDER
ANOTHER STATUTE.**

**A.  The Government Established That
Exemptions 1 And 3 Apply To The Classified
Documents And Information Withheld.**

1. The district court correctly held that the infor-
mation withheld under Exemption 1 was properly
classified under Executive Order 13,526, and that the
government's declarations established a logical and
plausible basis for the classification decisions.
SPA 34-36.

Plaintiffs do not dispute that the agencies followed
proper classification procedures and that "appropri-
ate affidavits have been filed by appropriate authori-
ties from each of the responding agencies" explaining
the basis for classification. SPA 36.

Furthermore, the government's declarations ex-
plained that providing detailed information about the
volume and nature of the classified documents locat-
ed in response to the FOIA requests "would reveal
classified information about the nature and extent of

30

the U.S. Government's classified counterterrorism activities," disclosure of which could harm the national security. JA 192. For instance, disclosing information about the number and nature of responsive but exempt documents in the CIA's possession would tend to reveal information about intelligence activities, intelligence methods, and CIA functions, which reasonably could be expected to harm our counterterrorism activities and damage foreign relations. JA 192-197, 217-224. Revealing the number or nature of DOD documents responsive to the ACLU's request would tend to disclose whether DOD had information about particular operations or individuals, thus potentially revealing the focus of military planning and DOD's knowledge about terrorist activities, disclosure of which could cause grave harm. JA 342. Given the nature of the information sought, and the deferential standard used to evaluate an agency's classification decisions, the district court correctly concluded that the government's explanations were plausible and logical. SPA 36.[9]

The district court also correctly recognized that legal analysis can, where appropriate, be classified.

_____

[9]  The New York Times incorrectly suggests that the district court only reviewed the procedural adequacy of the challenged classification decisions. NYT Br. 27. In fact, the district court amended its initial opinion to clarify that it reviewed the classification decision to determine if the classifying authority's explanation was plausible. Compare JA 6, Dkt. No. 32, at 36, with SPA 36.

Executive Order 13,526 authorizes an original classification authority to classify information where the unauthorized disclosure of the information "could reasonably be expected to cause identifiable or describable damage to the national security" and the information "pertains to" specified categories, including "intelligence activities (including covert action), intelligence sources or methods, or cryptology"; and "foreign activities of the United States." Exec. Order 13,526, § 1.4(c), (d), 75 Fed. Reg. at 709. Plaintiffs' request for legal analysis relating to the use of targeted lethal force against terrorists outside the United States seeks information that clearly would "pertain to" an intelligence activity, intelligence source or method, or foreign activity. The government's public and classified declarations established that disclosure of such legal analysis could reasonably be expected to cause serious and exceptionally grave damage to national security. JA 198.

2. The district court also correctly held that Exemption 3 applies to the withheld information about the nature of the responsive but exempt records − in particular, whether or not OLC had records containing legal advice to the CIA on the use of targeted lethal force; and whether or not the CIA had responsive records relating to specific subcategories of information sought by the ACLU. Information about the CIA's "functions" is protected against disclosure under 50 U.S.C. § 403g, and "intelligence sources and methods" are protected under 50 U.S.C. § 403-1(i)(1). Acknowledging whether or not there were responsive OLC records that pertained to the CIA would tend to reveal whether the CIA had sought advice about its

32

possible authority to take part in targeted lethal operations against terrorists, including U.S. citizens. The CIA's involvement, if any, in operations involving targeted lethal force would disclose information about the CIA's "functions" and "intelligence sources and methods" that is exempted from disclosure under Exemption 3. Similarly, acknowledging whether or not the CIA had records pertaining to subcategories of the ACLU's request concerning specific individuals would tend to reveal intelligence sources and methods.

The New York Times argues that OLC legal advice cannot constitute an "intelligence source or method" protected under the relevant statues. But Exemption 3 does protect legal advice to the extent it incorporates information that would tend to reveal intelligence sources and methods. Furthermore, whether or not OLC provided legal advice to the CIA is itself exempt from disclosure under Exemption 3, because it tends to disclose whether or not the CIA engaged in clandestine activities using targeted lethal force against terrorists. Exemption 3 protects against the disclosure not only of intelligence sources and methods themselves, but also of information that would tend to disclose an intelligence source or method. *See, e.g., Berman v. CIA,* 501 F.3d 1136, 1141-1142 (9th Cir. 2007); *Halperin v. CIA,* 629 F.2d 144, 147-150 (D.C. Cir. 1980).

**[Classified Insert C]**

33

### B. The District Court Did Not Err In Concluding That The Government Had Not Officially Disclosed The Types Of Information Or Documents Requested, So As To Lose The Protections Of FOIA Exemptions 1 and 3.

The New York Times and the ACLU argue that the agencies' Glomar and no number, no list responses under Exemptions 1 and 3 were inappropriate because the information sought had been officially disclosed. "A strict test applies to claims of official disclosure," and classified information will not be deemed to have been officially disclosed unless it "(1) is as specific as the information previously released, (2) matches the information previously disclosed, and (3) was made public through an official and documented disclosure." *Wilson v. CIA,* 586 F.3d 171, 186 (2d Cir. 2009) (quoting *Wolf,* 473 F.3d at 378). The district court properly concluded, after exhaustively reviewing the proffered public statements, that none met the stringent criteria for official disclosure of the specific documents and information sought by plaintiffs.

### 1. Most Of The "Disclosures" On Which Plaintiffs Rely Are Irrelevant, Because Official Disclosures Can Only Be Made By Persons Authorized To Speak For The Agency.

At the outset, it is vital to evaluate the disclosures on which plaintiffs rely in light of the applicable legal standard. This Court has recognized the "critical difference between official and unofficial disclosures" of

34

classified information, in the context of determining whether there had been official disclosure of an individual's clandestine employment by the CIA. *Wilson,* 586 F.3d at 186. "[T]he law will not infer" official disclosure of classified information from "(1) widespread public discussion of a classified matter, * * * (2) statements made by a person not authorized to speak for the Agency, * * * or (3) release of information by another agency, or even by Congress." *Id.* (citations omitted). The great majority of "public disclosures" on which plaintiffs rely cannot, as a matter of law, support their argument that the government has officially disclosed information protected by FOIA Exemptions 1 and 3.

Plaintiffs rely heavily on statements made by Members of Congress to argue that classified information withheld by the CIA, DOD, and DOJ has been officially disclosed. *See* ACLU Br. 12-13, 15-19, 24 nn. 9-10 (discussing statements by Sen. Feinstein and Rep. Rogers). But as this and other courts have recognized, the release of information by Congress (and, presumably, an individual Member of Congress) does not constitute official disclosure of classified information by the relevant Executive Branch agency. *See Earth Pledge Foundation v. CIA,* 988 F. Supp. 623, 627-628 (S.D.N.Y. 1996), *aff'd,* 128 F.3d 788 (2d Cir. 1997) (cited with approval in *Wilson,* 586 F.3d at 186-187); *Military Audit Project v. Casey,* 656 F.2d 724, 742-745 (D.C. Cir. 1981); *see also Moore v. CIA,* 666 F.3d 1330, 1333 n.4 (D.C. Cir. 2011) ("[W]e do not deem 'official' a disclosure made by someone other than the agency from which the information is being

35

sought." (quoting *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999)).

To hold otherwise would permit Members of Congress who might have been provided with classified information in the course of their official duties to override an Executive Branch classification decision without authorization to do so. *Cf. Murphy v. Dep't of Army*, 613 F.2d 1151, 1156 (D.C. Cir. 1979) (rejecting an interpretation of FOIA that would "effectively transform section [552(d)] into a congressional declassification scheme," which would pose "obvious problems, constitutional and otherwise," with regard to national security information protected under Exemption 1). Furthermore, and without commenting on the specific allegations in this case, a classifying agency's interests in withholding information can remain compelling notwithstanding congressional disclosure. Courts have recognized, for example, that the fact the CIA provides certain classified information to Congress in its oversight role does not undermine the CIA's "ongoing interest in assuring its sources of its continued adherence to its strict policy of not revealing sources" and in refusing to confirm the existence of CIA operations in other countries. *Earth Pledge Foundation*, 988 F. Supp. at 627-628; *see also Afshar v. Dep't of State*, 702 F.2d 1125, 1130-1131 (D.C. Cir. 1983); JA 226 ("[I]ntelligence sources must be certain that the CIA can and will do everything in its power to prevent the public disclosure of

their association with the CIA.").[10] The statements of Members of Congress should not be considered in determining whether there has been an official disclosure of information withheld under a FOIA exemption by the Executive Branch.

Plaintiffs also rely on statements made by former government officials in arguing that there has been official disclosure of information they have requested. *See* ACLU Br. 15 & nn. 4-5 (relying on statements by former CIA officials). Once again, however, the decisional law holds uniformly that a statement by a former official is insufficient to constitute official disclosure by the agency. *See, e.g., Wilson,* 586 F.3d at 186-187*; Phillippi v. CIA,* 655 F.2d 1325, 1331 (D.C. Cir. 1981) (statements by former CIA director that had been pre-cleared by agency for public disclosure do not constitute agency disclosure); *Afshar,* 702 F.2d at 1133-1134 (statements made by former CIA officials

---

10   The ACLU relies on an unpublished D.C. Circuit decision to argue that disclosures by Members of Congress can constitute official acknowledgment. ACLU Br. 38 n.19. That court specifically declined to reach the issue, *see Hoch v. CIA,* No. 88-5422, 1990 WL 102740, at *1 (D.C. Cir. Jul. 20, 1990), and the D.C. Circuit later held that publication by Congress does not necessarily constitute official disclosure. *See Fitzgibbon v. CIA,* 911 F.2d 755, 765-766 (D.C. Cir. 1990) (reasoning "that executive branch confirmation or denial of information contained in congressional reports could under some circumstances pose a danger to intelligence sources and methods").

37

and pre-cleared by the agency do not constitute agency disclosure).

Finally, plaintiffs rely on statements by unknown or unidentified officials in press accounts, as well as reporters' statements, to argue that there has been official disclosure of the information they have requested. *See* ACLU 5-6 & n.1, 15 & n.5, 17. But it is well-established that a reporter's speculation, or statements by unattributed or unknown government officials, cannot constitute official disclosure. *See, e.g., Wilson,* 586 F.3d at 186; *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1370 (4th Cir. 1975).

## 2. The District Court Correctly Held That The Limited Public Disclosures By Authorized Government Officials On The Topic Of The Requests Did Not Foreclose OLC's Glomar Response To The New York Times Requests And The Agencies' No Number, No List Responses To The ACLU's Request.

The district court properly concluded that the limited public disclosures by authorized Executive Branch officials identified by the plaintiffs, and relating to the United States Government's use of targeted lethal force, did not disclose the specific information that was the subject of OLC's Glomar response to the New York Times requests and the agencies' no number, no list responses to the ACLU request. As agency officials explained in their declarations, the information sought would tend to disclose the identity of the agency or agencies that use targeted lethal force against certain terrorists who are U.S. citizens, how

38

many operations have been considered or attempted, the factual basis for the operations, operational details, and sources and methods of intelligence. The district court properly concluded, based on these public and classified declarations, that the compelled disclosure of this information could reasonably be expected to harm national security.

a. The New York Times argues that DOJ cannot issue a Glomar response refusing to confirm or deny the existence of any OLC legal advice memoranda pertaining to the CIA, because "[n]umerous public statements by executive branch officials, including the President and the former Director of the CIA, have made clear the CIA's authority, interest, or involvement in the targeted killing program." NYT Br. 17. Although the government has publicly disclosed that the CIA has an intelligence interest in targeted killing, however, the government has never disclosed (with the exception of the Bin Laden operation) whether the CIA has any operational role in the use of targeted lethal force or is authorized to use such force. The district court properly recognized this distinction in upholding OLC's Glomar response to the New York Times requests pertaining to the CIA. SPA 64-66.

The New York Times quotes from a January 29, 2012 CBS News interview with Leon Panetta after he became Secretary of Defense, in which Defense Secretary Panetta stated that the use of lethal force against U.S. citizens requires a "recommendation the CIA director makes * * * but in the end when it comes to going after someone like that, the President

39

of the United States has to sign off." NYT Br. 19. This statement does not disclose whether the CIA or any other specific component of the U.S. Government conducts drone strikes, nor does it disclose any information about such strikes. Panetta's passing references in 2011 to Predators also does not confirm that the CIA engages in the use of targeted lethal force. *Cf. www.af.mil/information/factsheets/factsheet.asp?fsID=122* (describing the Predator as "an armed, multi-mission, medium-altitude, long-endurance remotely piloted aircraft that is employed primarily as an intelligence-collection asset").

The New York Times argues that the D.C. Circuit rejected a similar Glomar response in *ACLU v. CIA,* 710 F.3d 422 (D.C. Cir. 2012), but that decision − which involves a FOIA request that is materially different from the New York Times requests − affirmatively *supports* the government's position here. In *ACLU v. CIA,* the plaintiff's FOIA request sought records from the CIA "pertaining to the use of" drones, without limitation to drones operated by the CIA. 710 F.3d at 425, 428. The CIA initially issued a Glomar response, which it justified as necessary to protect information about whether the CIA was either "involved in, or interested in, such strikes." *Id.* at 428. While the appeal was pending in the D.C. Circuit, the government moved to remand, taking the position that, in light of the disclosures in this litigation about the existence of responsive documents, the CIA could modify its Glomar request to acknowledge a general interest in the broad topics addressed by the ACLU's FOIA request. *See id.* at 431-432. The court of appeals reasoned that the FOIA request was

40

not limited to documents "about drones operated by the [CIA]," *id.* at 428, and that acknowledging the existence of responsive documents would not disclose whether the CIA operates drones, and accordingly concluded that a Glomar response was not justified. *Id.* at 428-429. The Court recognized, however, that the CIA might be justified in withholding information from a *Vaughn* index or in submitting a no number, no list response to the pending request. *Id.* at 432-433.

The New York Times requests, unlike the FOIA request in the D.C. Circuit case, seeks OLC opinions pertaining to the CIA, relating to the use of targeted lethal force. JA 297 (requesting OLC records that address the "legal status of targeted killing" of terrorists, "includ[ing] legal advice on these topics to * * * the Central Intelligence Agency"), 301. Disclosing whether OLC provided legal advice to the CIA on the lawfulness of targeted lethal force would not reveal whether the CIA has an intelligence interest in that subject, which CIA has acknowledged. Instead, it would reveal whether the CIA itself was operationally involved in lethal targeting operations or was authorized to conduct such operations, as well as CIA interest in specific operations against identified individuals. That information remains properly classified, *see* JA 204-205, 221, and the D.C. Circuit did not hold to the contrary.

As the declarations submitted in district court explained, disclosure of whether or not the CIA was involved in particular targeting operations could reveal whether or not the CIA is using unmanned aerial ve-

41

hicles as a weapon or is engaged in clandestine intelligence activities. JA 219-221. Disclosing whether or not the CIA has intelligence about the imminence of threat posed by a particular individual, such as Anwar al-Awlaki, could reveal information about the existence and identity of particular intelligence sources and methods. JA 221-223. The district court properly concluded that that information remained classified and statutorily prohibited from disclosure. SPA 66-67.

**[Classified Insert D]**

b. The ACLU also challenges the "no number, no list" responses by DOJ, DOD, and CIA, on the ground that the information they seek has been officially disclosed. Once again, however, the district court properly concluded that the information sought by the plaintiffs was not the specific information that had been officially disclosed by authorized Executive Branch officials. SPA 65-67.

The ACLU argues that senior government officials officially disclosed that the CIA conducts lethal targeting operations, ACLU Br. 38-39, but we have already explained why that assertion is erroneous. The ACLU quotes a June 2010 interview with then-CIA Director Leon Panetta, but Panetta's statement, in response to questions about whether the U.S. Government was winning the war in Afghanistan and weakening the Taliban, was: "We are making progress * * * looking at about 100,000 troops being added by the end of August. * * * * [W]e are engaged in operations with the military that is going after Taliban leadership." JA 628. Panetta's subsequent state-

42

ment that "[w]e just took down number three in their leadership a few weeks ago" does not disclose what government agency conducted that operation or the role, if any, of the CIA. JA 628. Similarly, Panetta's statement in a 2009 speech about the precision of remote drone strikes, and his statement in a March 2010 Wall Street Journal article, do not identify the government agency or component conducting strikes. The ACLU's quote from the Wall Street Journal article conveniently omits the prior sentence, which makes clear that "Mr. Panetta didn't speak directly to the circumstances" of Hussein al-Yemeni's death and "the CIA doesn't discuss covert action." JA 622. The ACLU's brief also contains a purported quotation from an October 2012 interview with John Brennan, but the quoted words are not Brennan's own words but instead the reporter's characterization of information including statements by unidentified and former officials as well as third parties. JA 837-838, 843, cited in ACLU Br. 15. As the D.C. Circuit recently concluded after reviewing the same material, "these statements do not acknowledge that the CIA itself operates drones." *ACLU v. CIA,* 710 F.3d at 429.

Nor, contrary to the ACLU's argument, ACLU Br. 39, has the government publicly disclosed that DOD conducts targeted lethal operations against U.S. citizens or its role in any particular operation. The ACLU cites public statements by then-Secretary of Defense Leon Panetta in 2011 about a strike against Anwar al-Awlaki, but Panetta specifically cautioned that he would not speak to "the operational elements" of the strike "except to say that we've been working with the [Yemenis] over a long period of time to be

43

able to target Awlaki and I want to congratulate them on their efforts, their intelligence assistance, their operational assistance to get this job done." JA 799.[11] In response to a question about al-Awlaki in an October 2011 interview, the President responded that, "working with the [Yemenis], we were able to remove him from the field." JA 555-556. The ACLU identifies statements by senior Executive Branch officials that generally acknowledge that "the United States Government conducts targeted strikes against specific al-Qaida terrorists, sometimes using remotely piloted aircraft," or drones, JA 95, but those officials refused to "discuss the sensitive details of any specific operation" or "publicly divulge sensitive intelligence sources and methods." JA 95; *see also* JA 85 (Attorney General statement that he would not "discuss or confirm any particular program or operation").[12] Once again, the public statements do not confirm that DOD engages in the use of targeted lethal force against U.S. citizens, or provide any details about DOD operations, if any. JA 342. Providing additional infor-

———————

[11]  The ACLU also relies on a news article in the Armed Forces Press Service, ACLU Br. 17, but the quotation in their brief is from a reporter's characterization of the facts, not any confirmation by an authorized official.

[12]  To the extent the ACLU cites and quotes from public statements by additional Executive Branch officials in their brief, ACLU Br. 11-12, those statements do not contain any materially different information.

44

mation about DOD's possession of responsive records
would tend to disclose the nature and extent of lethal
targeting operations and DOD's involvement in such
operations, implicating classified information about
military operations, intelligence sources and meth-
ods, and foreign government information. JA 342.

Finally, the district court properly upheld DOJ's
no number, no list response to the ACLU's request.
SPA 66-67. Although OLC has acknowledged the ex-
istence of an OLC memorandum to the Attorney Gen-
eral addressing a potential lethal targeting operation
in a foreign country relating to DOD, OLC has not
acknowledged the quantity of any additional respon-
sive classified documents in OLC's possession or the
agency or agencies to which they pertain. JA 188,
211, 291, 294. The ACLU references statements by
Executive Branch officials referring to OLC advice,
ACLU Br. 24-25, but "[i]n none of these statements is
there a reference to any particular records" in OLC's
possession that are responsive to the ACLU's request,
"let alone the *number* or *nature* of those records."
SPA 67. Disclosing this information could reveal
whether lethal targeting operations are being con-
ducted by other agencies of the United States Gov-
ernment and, if so, which agencies. JA 193-194. Dis-
closure could also reveal the depth and breadth of
United States lethal targeting operations, including
whether the United States is operating or planning
clandestine operations within another country's bor-
ders. JA 194-197.

The ACLU also argues that, once the agencies
identified and described some responsive records,

45

they lost the ability to make a no number, no list response as to additional records. ACLU Br. 46. The fact the government has sought to provide as much information as possible publicly, without disclosing classified information, should not be held against it. *See Bassiouni,* 392 F.3d at 247; *cf. Military Audit Project,* 656 F.2d at 754 (rejecting the "perverse theory that a forthcoming agency is less to be trusted in its allegations than an unyielding agency" and reasoning that the government's voluntary release of substantial amounts of responsive documents suggests "a stronger, rather than a weaker, basis for the classification of those documents still withheld").

In *Wilner*, this Court held that the government's public acknowledgment of the existence and purpose of a clandestine intelligence program did not preclude a *Glomar* response to a request for specific surveillance methods used, the targets of surveillance, and information obtained. 592 F.3d at 69-70. As the Court emphasized, the agency lost its ability to make a *Glomar* response only if it had officially disclosed "the existence or nonexistence of the particular records covered by the *Glomar* response." *Id.* at 70. Here, the district court properly concluded that, because the withheld information is not the same information officially disclosed by the Executive Branch, the no number, no list responses to the ACLU's request were justified. SPA 67.

46

### 3. In Light Of Subsequent Public Disclosures By The President And Attorney General, DOJ Can Provide Limited Additional Information About Documents Responsive To The ACLU's Request, But The Government's Responses Otherwise Remain Appropriate.

As described above (at pp. 23-26, *supra*), following the district court's decision in this case, the government publicly disclosed additional information about the United States Government's use of targeted lethal force, including that the United States conducted the targeting operation that resulted in the Anwar al-Awlaki's death. At the time the agencies processed their responses to the plaintiffs' requests, the United States had not acknowledged its role with respect to any particular individual or operation. An agency, of course, must process a FOIA request at a particular point in time and make its administrative determinations based on the facts at that time. The fact that subsequent developments might have led an agency to respond differently if the same FOIA request were submitted at a later date does not establish that the agency's initial response was inadequate. *See, e.g., Meeropol v. Meese,* 790 F.2d 942, 959 (D.C. Cir. 1986); *Bonner v. Dep't of State,* 928 F.2d 1148, 1152 (D.C. Cir. 1991). Similarly, when an agency submits declarations in support of summary judgment in district court, defending the adequacy of the administrative response to a FOIA request, those declarations are based on the information known to the declarant at that time. Judicial review "properly focuses on the time the determination to withhold is made," *Bonner,*

47

928 F.2d at 1152, and this Court should consider whether the district court properly entered summary judgment for the agencies as to the adequacy of their responses to the plaintiffs' FOIA requests at the time those responses were made, and based on the record before that court.

In light of the public interest in these issues, however, the government has evaluated its prior responses in light of public disclosures made after the district court's decision. Given recent acknowledgments by the President and other senior officials of the previously properly classified fact that the United States carried out the targeted strike that killed Anwar al-Awlaki, DOJ has now determined that it can provide some limited additional information about classified documents in its possession that are responsive to the ACLU request. Specifically, DOJ can now disclose that there are a significant number of responsive classified records, consisting of legal advice and analysis (including about al-Awlaki), requests for legal advice, internal Executive Branch legal deliberations (including legal and factual input and comments on draft legal advice and analysis), summaries of legal advice and analysis, internal attorney work product (such as draft legal advice and analysis, preliminary outlines of the same, and related questions and notes), and confidential factual information regarding terrorist organizations and individuals potentially involved in such organizations received from Executive Branch clients. However, even with the President's acknowledgment of the previously properly classified fact that the United States carried out this particular operation, DOJ is not in a position to dis-

close additional details about the dates, nature, recipients, or contents of the classified responsive DOJ records, because such details would tend to reveal information protected under FOIA Exemptions 1, 3, and 5. DOJ's additional disclosures made in response to recent public acknowledgments should not affect (or be relevant to) this Court's review of the district court's legal analysis and conclusion that the administrative record establishes that the withheld information and records sought were properly withheld under Exemptions 1, 3, and/or 5.[13]

## POINT II

## THE GOVERNMENT PROPERLY WITHHELD CONFIDENTIAL LEGAL ADVICE MEMORANDA UNDER EXEMPTION 5, AND HAS NOT "ADOPTED" THE WITHHELD DOCUMENTS OR USED THEM AS "WORKING LAW."

Plaintiffs also contest the agencies' withholding of the OLC-DOD memorandum, the two DOD unclassi-

---

[13]  If, however, the Court determines that the recent public disclosures are relevant to determining whether the agencies' responses to the plaintiffs' FOIA requests were adequate, the government respectfully requests that it be given an opportunity to submit new declarations before the Court considers whether withholding of information is no longer justified in light of those disclosures, which were not addressed in the declarations filed in support of summary judgment.

49

fied legal memoranda identified on DOD's *Vaughn* index, and an unidentified number of additional OLC documents. Those privileged documents were properly withheld under Exemption 5.

### A. The Government Established That The OLC-DOD Memorandum Is Protected By The Attorney-Client And Deliberative Process Privileges.

Emphasizing that the government has the burden to establish Exemption 5's applicability, the New York Times argues that the government failed to establish that the OLC-DOD Memorandum contains confidential legal advice or is predecisional and deliberative. NYT Br. 35-38. But the New York Times conceded in district court that the government had satisfied its threshold burden to show that the document was privileged, absent adoption or incorporation by reference. *See* JA 4, Dkt. No. 20, at 14 ("NYT does not dispute that Exemption 5's deliberative process privilege and attorney-client privilege once applied to the OLC DOD Memorandum."); SPA 52.

In any event, the government clearly met its burden. OLC official John Bies explained that the OLC-DOD memorandum "contains confidential legal advice to the Attorney General, for his use in interagency deliberations, regarding a potential military operation in a foreign country." JA 289; *see In re County of Erie,* 473 F.3d 413, 418 (2d Cir. 2007) (attorney-client privilege protects confidential communications between "government counsel and their clients that are made for the purpose of * * * providing legal assis-

50

tance"). Bies also explained that the document "was prepared in advance of Executive Branch decisions regarding a potential military operation in a foreign country" and "contains confidential legal advice by OLC attorneys to other Executive Branch officials in connection with potential decisions regarding such an operation." JA 289-90; *see Tigue v. DOJ,* 312 F.3d 70, 80 (2d Cir. 2002) (deliberative process privilege protects document "prepared in order to assist an agency decisionmaker"). The New York Times argues that this is insufficient detail about the memorandum's "timing, origins, use, circulation, or disposition," NYT Br. 37, but any lack of detail in the public record is unsurprising given that the document is classified.

**[Classified Insert E]**

## B. The Government Has Not "Adopted" The Withheld Legal Memoranda, Nor Do They Constitute An Agency's "Working Law."

This Court has held that confidential legal advice that would otherwise be protected under Exemption 5 pursuant to the deliberative process and attorney-client privileges is subject to compelled disclosure if it has been expressly adopted or incorporated by reference by the agency or if it constitutes the agency's "working law." *Brennan Center,* 697 F.3d at 194-95, 199.[14] The district court correctly concluded (SPA 55-61) that neither concept applies here.[15]

---

[14] In *Brennan Center,* this Court held that, when a predecisional and deliberative document is adopted or incorporated by reference, it also loses the protec-

51

## 1. No Agency Official Has Publicly Referred To The OLC-DOD Memorandum Or Any Other Withheld Document, Much Less Expressly Adopted The Reasoning In That Document As Agency Policy.

Plaintiffs have not identified a single instance in which an Executive Branch decisionmaker publicly

---

tion of the attorney-client privilege. 697 F.3d at 207-208. In the government's view, that holding was erroneous. *See Federal Open Market Committee v. Merrill,* 443 U.S. 340, 360 n.23 (1979). Although we recognize that *Brennan Center* is binding on a panel of this Court, we preserve the challenge for purposes of any subsequent review.

15 Furthermore, even if the government had "adopted" privileged legal analysis or used it as "working law" in a manner that stripped it of Exemption 5 protection, the government could not be compelled to disclose any of those legal memoranda that are also protected under Exemption 1 and/or Exemption 3 − and plaintiffs do not claim otherwise. The "adoption" and "working law" theories are limited to the Exemption 5 context and have no relationship to the application of Exemptions 1 and 3. Unless the stringent requirements for official disclosure have been met, the fact that a government official publicly acknowledges the existence of a document protected by Exemption 1 and/or 3 does not undermine the government's interest in protecting the contents of that document from public disclosure.

52

invoked as the basis for agency policy the OLC Memorandum, the unclassified legal memoranda in DOD's possession, or any other document withheld under Exemption 5. Indeed, the New York Times explicitly concedes that no government official has "referred specifically to the OLC DOD Memorandum." NYT Br. 46. This precludes a finding of express adoption based on the principles set forth in *Brennan Center* and *National Council of La Raza v. Department of Justice,* 411 F.3d 350 (2d Cir. 2005).

Contrary to the premise of plaintiffs' argument, NYT Br. 45-49, "express adoption" based on public statements must indeed be express—the decisionmaker must make a considered public reference demonstrating reliance on both the conclusion and the reasoning of the document as the basis for agency policy. In *NLRB v. Sears, Roebuck & Co.,* the Supreme Court emphasized (literally) the requirement that adoption be express. 421 U.S. 132, 161 (1975) (reasoning that a document loses Exemption 5 protection under the deliberative process privilege "if an agency chooses *expressly* to adopt or incorporate [it] by reference"). And in *Brennan Center*, this Court made clear that adoption through public statements requires some "explicit reference" to a specific document. 697 F.3d at 204; *compare id.* at 203-05 (finding express adoption based on two public statements explicitly referencing the document in connection with explaining policy), *with id.* at 205-07 (holding that two draft OLC memoranda were not expressly adopted in the absence of any specific public reference to them by agencies).

53

Although the New York Times is correct that this Court "eschewed a bright-line test" requiring "'specific explicit language of adoption or incorporation'" in *La Raza*, NYT Br. 46, the Court made clear that adoption must still be "express" and "explicit." 411 F.3d at 357 & n.5, 359-60. The finding of adoption in *La Raza* was based on multiple public statements by the Attorney General and other senior DOJ officials referencing the withheld document and embracing its conclusion and reasoning. *See id*. at 353-59. Nothing remotely similar exists here.

Plaintiffs theorize that public discussion by the Attorney General and other Executive Branch officials of the legal principles that apply to U.S. targeting decisions must be similar to the legal advice in the OLC-DOD memorandum and other withheld documents. NYT Br. 48; ACLU Br. 54-55. But the law is clear that "there must be evidence that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice." *Brennan Center*, 697 F.3d at 199 n.9 (citation and quotation marks omitted). As the district court recognized, "there is no suggestion" in any public statements by government officials about the use of targeted lethal force "that the legal reasoning being discussed is the reasoning" in the withheld documents. SPA 58-59. Plaintiffs' adoption argument is based on "sheer speculation" about the content of the withheld documents. SPA 60. At bottom, plaintiffs' argument is that legal advice from OLC and DOD on the topic of targeted lethal operations must be disclosed because

54

government officials publicly discussed that broad topic. That is not the law.[16] Plaintiffs' proposed rule would have the perverse effect of deterring agencies from describing the legal basis for their conduct publicly out of concern that such explanations would risk removing the protection of the deliberative process and attorney-client privileges for any arguably related predecisional advice.

The district court also correctly rejected plaintiffs' request that the court review the OLC-DOD memorandum *in camera*. *In camera* review of a privileged, predecisional document cannot shed any light on whether any decisionmaker expressly adopted or incorporated that document as agency policy. As the district court observed, "[e]ven if the [OLC-DOD memorandum] contains language *identical* to that uttered by the Attorney General and others in the various public statements on which Plaintiffs rely, that would still not necessarily constitute proof that the Government had adopted *this document in particular* as its policy." SPA 61.

_____

[16] ACLU also claims that "[t]he administration has made clear that the White Paper was drawn from one or more of the OLC memoranda," ACLU Br. 24, but no Executive Branch official has made any such statement. The isolated references to "OLC advice" cited by the ACLU, *id.* 24-25, do not come close to establishing express adoption of the OLC-DOD Memorandum or any other document as government policy.

55

Finally, the New York Times urges this Court to consider the "motivation of senior officials in speaking about the legal basis for targeted killing," arguing that *La Raza* requires a finding of adoption "[w]here an explanation is made to 'assure third parties as to the legality of the actions the third parties were being urged to take.'" NYT Br. 48-49. In *La Raza*, high-level agency officials publicly assured third parties that an OLC memorandum demonstrated "the legality of the actions" the Department of Justice was urging them to take, and that the OLC memorandum was the basis for the agency's own change in policy. 411 F.3d at 357. Here, in contrast, the government has merely identified publicly the legal principles considered in using targeted lethal force, without referencing confidential legal advice memoranda that may have been received or considered.

### 2. The Withheld Legal Memoranda Constitute Confidential Legal Advice, Not Agency "Working Law."

Plaintiffs fare no better in arguing that the withheld documents constitute agency "working law" subject to compelled disclosure under FOIA. *Brennan Center*, 697 F.3d at 199. Because the withheld legal advice memoranda that plaintiffs seek have no legal effect on private parties, the concept of "working law" is not even potentially applicable here.

As the D.C. Circuit recognized in *Afshar v. Department of State,* "working law" refers to "those policies or rules, and the interpretations thereof, that 'either create or determine the extent of the substantive

rights and liabilities of a person.'" 702 F.2d at 1141 (quoting *Cuneo v. Schlesinger,* 484 F.2d 1086, 1090 (D.C. Cir. 1973)). The basic concept of "working law" derives from FOIA's affirmative requirement that agencies must disclose "rules governing relationships with private parties and [ ] demands on private conduct." *Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 772 n.20 (1989) (quotation omitted); *accord Brennan Center,* 697 F.3d at 201-202.

The legislative history of FOIA underscores its focus on rules used by agencies to determine the rights and obligations of the public. FOIA was originally enacted as an amendment to a provision of the Administrative Procedure Act that required agencies to make public agency rules, opinions, and orders that affect the rights and obligations of members of the public. *See* 5 U.S.C. § 1002 (repealed 1966). The core function of the APA's "public information" section was to allow individuals who were subject to federal agency regulation to be aware of the rules that would be applied to them, so that they could adjust their conduct accordingly. *See* H.R. Rep. No. 79-1980, at 21 (1946). Congress retained a similar requirement in FOIA to provide "the private citizen the essential information to enable him to deal effectively and knowledgeably with the Federal agencies" and to prevent him "from losing a controversy with an agency because of some obscure and hidden order or opinion which the agency knows about but which has been unavailable to the citizen." S. Rep. No. 89-813, at 7 (1965).

57

This aspect of FOIA has no application to the confidential OLC memorandum sought by plaintiffs, which does not opine on the legal rights of the public but rather serves to provide confidential legal advice to the Attorney General and the Executive Branch regarding policy on the use of force. As this Court recognized in *Brennan Center,* OLC's legal advice − as opposed to any decisions or policies that might be informed by that advice − is not the working law of any agency. "OLC's legal advice and analysis informs the decisionmaking of Executive Branch officials on matters of policy, but OLC's legal advice is not itself dispositive as to any policy adopted." 697 F.3d at 203 (quoting declaration of Paul Colborn, OLC Special Counsel). It was precisely on this basis that the Court concluded that the OLC documents in *Brennan Center* were not working law. *Id.* Here, too, the withheld memorandum is not used by agency officials to determine an individual's rights or obligations, and for that additional reason could not constitute "working law" outside the protection of Exemption 5.[17] Similar-

––––––––––

[17] Furthermore, the OLC-DOD Memorandum was prepared by OLC for the Attorney General. Because the Attorney General is OLC's superior, *see* 28 C.F.R. § 0.5(a), and indeed, OLC exercises the Attorney General's own delegated authority when it provides legal advice, *see id.* § 0.25, legal advice rendered by OLC to the Attorney General obviously could not have been binding. *Cf. Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) (legal memoranda from the Office of the Legal Adviser, a subordinate, to the Secretary of State were protected by the deliberative

58

ly, there is no evidence that the unclassified DOD le-
gal memoranda sought by the ACLU, which were
sent from a DOD attorney to an NSC attorney, nei-
ther of whom had policymaking authority, JA 865-
866, were "effectively binding" in any respect. *Bren-
nan Center,* 697 F.3d at 203.[18]

—————————

process privilege because the Office of the Legal Ad-
viser "has no authority to make final decisions" con-
cerning U.S. policy).

[18] The New York Times relies on *Coastal States
Gas Corp. v. Dep't of Energy,* 617 F.2d 854 (D.C. Cir.
1980), *Public Citizen, Inc. v. Office of Mgmt. and
Budget,* 598 F.3d 865 (D.C. Cir. 2010), and *Tax Ana-
lysts v. IRS,* 294 F.3d 71 (D.C. Cir. 2002), but those
decisions involved agency documents that established
the rule of decision in particular matters that came
before the agency, and have no application to legal
advice memoranda that merely inform an agency's
policy choices. *See Brennan Center,* 697 F.3d at 200-
201 (describing cases); *see also Coastal States,* 617
F.2d at 867 (requiring disclosure of "secret law" used
by agency "in the discharge of its regulatory duties
and in its dealings with the public"); *Public Citizen,*
598 F.3d at 875 (requiring disclosure of documents
that "reflect[ ] OMB's formal or informal policy on
how it carries out its responsibilities," but not docu-
ments "mak[ing] recommendations for policy change"
or "reflect[ing] internal deliberations on the advisa-
bility of any particular course of action"); *Tax Ana-
lysts,* 294 F.3d at 80 (requiring disclosure of docu-
ments conceded to be "all but identical to" documents

59

John Brennan's statement that "Office of Legal Counsel advice establishes the legal boundaries within which we can operate," ACLU Br. 55, does not transform OLC's confidential legal advice into "working law." As noted *supra*, note 16, plaintiffs offer nothing but speculation that Mr. Brennan's reference to OLC "advice" in fact referred to any particular document, such as the OLC-DOD memorandum.[19] In any event, even if the government viewed any particular OLC advice as establishing the "boundaries" within which a particular operation would be lawful, the ultimate decision as to whether or in what circumstances to employ targeted lethal force is a policy decision that does not rest with OLC. (See JA 280). It cannot be said that the OLC-DOD memorandum, addressing a potential military operation in a foreign country, "left [the Executive Branch] 'with no decision to make.'" *Brennan Center*, 697 F.3d at 203 (quoting *Sears*, 421 U.S. at 155). As in *Brennan Center*, "[n]o one at the OLC made [any] decision" with regard to that potential military operation. 697 F.3d at 203. Confidential legal advice about potential policy decisions "fits exactly within the deliberative process rationale for Exemption 5" and does not qualify as "secret law." *Brinton v. Dep't of State,* 636 F.2d 600, 604-605 (D.C. Cir. 1980).

––––––––––

at issue in prior case, which were circulated to IRS field personnel to apply in their dealings with the taxpaying public).

   [19]   **[Classified Insert F]**

60

## POINT III

## THE DEPARTMENT OF JUSTICE'S OFFICE OF INFORMATION POLICY CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE DOCUMENTS

The ACLU's last-ditch challenge to the adequacy of the search for responsive documents conducted by OIP is meritless.

The ACLU argues that OIP's search must have been inadequate because another DOJ component discovered responsive documents not identified by OIP, but this Court has emphasized that the fact a search does not identify all responsive documents does not show inadequacy. *See Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d 473, 489 (2d Cir. 1999) ("an agency's search need not be perfect, but rather need only be reasonable"). The ACLU also argues that OIP should have realized its search was inadequate based on OLC's discovery of additional documents, but the ACLU's requests were submitted separately to the two different DOJ components, as required by regulation, *see* 28 C.F.R. §§ 16.1(b), 16.3(a), 16.4(a), and were processed separately by officials of the two different components. The ACLU's challenge to the cut-off date for the search is patently without merit, since the cut-off date was the date on which the search commenced. JA 418; *see, e.g., Edmonds Inst. v. U.S. Dep't of Interior*, 383 F. Supp. 2d 105, 110-111 (D.D.C. 2005) (endorsing the start date of a search as an appropriate cut-off date); *Defenders of Wildlife v. U.S. Dep't of Interior,* 314 F. Supp. 2d 1, 12 n.10

61

(D.D.C. 2004) (same). And the ACLU's argument that the search should have disclosed drafts of a White Paper is erroneous: the ACLU explicitly excluded "draft legal analysis" from the scope of its request. JA 418, 445.

## CONCLUSION

**For the foregoing reasons, the judgment of the district court should be affirmed.**

Dated:     New York, New York
           June 14, 2013

           Respectfully submitted,

           STUART F. DELERY
           *Acting Assistant Attorney*
               *General*

           MATTHEW COLLETTE
           SHARON SWINGLE
           *Attorneys, Appellate Staff*
           *Civil Division, United States*
               *Department of Justice*

PREET BHARARA
*United States Attorney for the*
*Southern District of New York*

SARAH S. NORMAND
*Assistant United States Attorney*

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 13,927 words in this brief.

PREET BHARARA
*United States Attorney for the*
*Southern District of New York*

By: SARAH S. NORMAND
*Assistant United States Attorney*

**ADDENDUM**

Add. 1

## 5 U.S.C. § 552(b)(1), (3), (5)

(b) This section does not apply to matters that are --

(1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

\* \* \*

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

\* \* \*

(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

\* \* \* \*

Add. 2

**50 U.S.C. § 403g**

In the interests of the security of the foreign intelligence activities of the United States and in order further to implement section 403-1(i) of this title that the Director of National Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure, the Agency shall be exempted from the provisions of sections 1 and 2 of the Act of August 28, 1935 (49 Stat. 956, 957; 5 U.S.C. 654), and the provisions of any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency: Provided, That in furtherance of this section, the Director of the Office of Management and Budget shall make no reports to the Congress in connection with the Agency under section 607 of the Act of June 30, 1945, as amended (5 U.S.C. 947(b)).

**50 U.S.C. § 403-1(i)(1)**

(i) Protection of intelligence sources and methods

(1) The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure.